**2014-1618, -1700**

# United States Court of Appeals
# for the Federal Circuit

ABT SYSTEMS, LLC,

*Plaintiff – Appellant*,

THE UNIVERSITY OF CENTRAL FLORIDA BOARD OF TRUSTEES,
on behalf of the University of Central Florida,

*Plaintiff*,

*v.*

EMERSON ELECTRIC CO.,

*Defendant – Cross-Appellant*.

*Appeals from the United States District Court for the Eastern District of
Missouri in Case No. 4:11-CV-00374-AGF, Judge Audrey G. Fleissig*

## CORRECTED PRINCIPAL BRIEF FOR CROSS-APPELLANT

Linda E.B. Hansen
Jeffrey N. Costakos
Kadie M. Jelenchick
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202
414-271-2400
lhansen@foley.com
jcostakos@foley.com
kjelenchick@foley.com

*Counsel for Cross-Appellant
Emerson Electric Co.*

October 28, 2014

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel for Cross-Appellant Emerson Electric Co. certifies the following:

1.     The full name of every party or amicus represented by me is: Emerson Electric Co.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  None.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: None.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected in this Court are:  Linda E.B. Hansen, Jeffrey N. Costakos, and Kadie M. Jelenchick, all of Foley & Lardner LLP.

October 28, 2014                                    /s/ Kadie M. Jelenchick
                                                    Counsel for Cross-Appellant

## **TABLE OF CONTENTS**

STATEMENT OF RELATED CASES ..................................................5

JURISDICTIONAL STATEMENT ...................................................5

ISSUE ON CROSS-APPEAL...........................................................5

ISSUES ON APPEAL ......................................................................5

STATEMENT OF THE CASE...........................................................7

STATEMENT OF FACTS .................................................................8

I.    THE TECHNOLOGY ...........................................................8

II.   MR. RUDD'S INVENTION .................................................13

III.  EMERSON'S PRODUCTS....................................................14

IV.   MARKING ............................................................................15

V.    DAMAGES.............................................................................16

VI.   THE JURY'S WILLFULNESS FINDING ............................18

SUMMARY OF THE ARGUMENT ...............................................20

ARGUMENT .................................................................................22

I.    STANDARDS OF REVIEW..................................................22

II.   EMERSON SHOULD PREVAIL ON ITS CROSS-APPEAL THAT
      THE PATENT-IN-SUIT IS INVALID AS OBVIOUS ................................24
      A.    The '017 Patent Is Obvious Because It Consists Of Prior Art
            Combinations That Do No More Than Yield Predictable
            Results ...................................................................................26
      B.    Claim 1 Of The '017 Patent Is Obvious...............................27
      C.    The District Court Erred In Determining That There Was
            Sufficient Evidence To Uphold The Verdict On Obviousness...........37
      D.    Emerson's Evidence Of Near-Simultaneous Invention By
            Others Supports An Obviousness Finding And Was Improperly
            Ignored By The District Court .........................................40

1

E.     ABT Failed To Raise Any Relevant Evidence To Contradict An Obviousness Finding ..........................................................................40

F.     The Dependent Claims Rise And Fall With Independent Claim 1 ..........................................................................................................43

III.   APPELLANT SHOULD NOT PREVAIL ON ITS APPEAL .....................44

A.     The Evidence Does Not Support A Finding Of Substantially Consistent And Continuous Marking ..................................................44

1.     The letters from licensees were inadmissible hearsay .............45

2.     There was insufficient testimony to establish marking ...........47

B.     ABT Did Not Prove The Damages It Seeks........................................51

1.     ABT requested the damages stipulation that it now claims was forced on it .........................................................52

2.     No authority permits Appellant's request................................54

C.     It Would Be Futile To Address The Objective Prong Of The Willfulness Analysis ...........................................................................57

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ..............................58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,
    960 F.2d 1020 (Fed. Cir. 1992) (*en banc*) ...........................................47

*Agrizap, Inc. v. Woodstream Corp.*,
    520 F.3d 1337 (Fed. Cir. 2008) .........................................................42

*Am. Med. Sys., Inc. v. Medi. Eng'g Corp.*,
    6 F.3d 1523 (Fed. Cir. 1993) ............................................................47

*In re Applied Materials, Inc.*,
    692 F.3d 1289 (Fed. Cir. 2012) .........................................................42

*Bayer Healthcare Pharms., Inc. v. Watson Pharms., Inc.*,
    713 F.3d 1369 (Fed. Cir. 2013) .........................................................41

*Boston Sci. Scimed, Inc. v. Cordis Corp.*,
    554 F.3d 982 (Fed. Cir. 2009) ......................................................23, 43

*Calmar, Inc. v. Emson Res.*,
    850 F. Supp. 861 (C.D. Cal. 1994) ....................................................49

*Finisar Corp. v. DirecTV Group, Inc.*,
    523 F.3d 1323 (Fed. Cir. 2008) ........................................................23

*Funai Elec. v. Daewoo Elecs.*,
    616 F.3d 1357 (Fed. Cir. 2010) ........................................................50

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966)...................................................................22, 23

*Guyton v. Tyson Foods, Inc.*,
    No. 13-2036, 2014 U.S. App. LEXIS 16278 (8th Cir. Aug. 25,
    2014) ...................................................................................23

*K&K Jump Start/Chargers v. Schumacher Elec. Corp.*,
    52 Fed. Appx. 135 (Fed. Cir. 2002).....................................................51

3

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007).............................................................26, 27, 32

*Maxwell v. J. Baker, Inc.*,
   86 F.3d 1098 (Fed. Cir. 1996) ......................................................44, 48

*Monarch Knitting Mach. v. Sulzer Morat GmbH*,
   139 F.3d 877 (Fed. Cir. 1988) ..........................................................40

*Motorola, Inc. v. United States*,
   729 F.2d 765 (Fed. Cir. 1984) ..........................................................47

*Ohio Willow Wood Co. v. Alps S., LLC*,
   735 F.3d 1333 (Fed. Cir. 2013) ........................................................42

*Penford Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
   662 F.3d 497 (8th Cir. 2011) ............................................................24

*Richardson-Vicks, Inc. v. Upjohn Co.*,
   122 F.3d 1476 (Fed. Cir. 1997) ........................................................22

*United States v. Pirani*,
   406 F.3d 543 (8th Cir. 2005) (*en banc*) ..........................................24

**Statutes**

35 U.S.C. § 103(a) ..................................................................................26

35 U.S.C. § 284......................................................................................19, 57

35 U.S.C. § 287......................................................................................44, 47

**Other Authorities**

Fed. R. Civ. P. 50(a)..............................................................................24, 52

Fed. R. Evid. § 803(6)............................................................................46

## STATEMENT OF RELATED CASES

No other appeal in or from the same civil action or proceeding in the lower court or body was previously before this or any other appellate court.

No case known to counsel to be pending in this or any other court will directly affect or be directly affected by this court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

Both the appeal and cross-appeal arise out of a final judgment in favor of Plaintiff – Appellant ABT Systems, LLC's ("ABT" or "Appellant") claims and on Defendant – Cross-Appellant Emerson Electric Co.'s ("Emerson") counterclaims, which was entered by the United States District Court for the Eastern District of Missouri, on February 13, 2014, following a jury trial.  A1.

## ISSUE ON CROSS-APPEAL

The issue presented by this cross-appeal is:

1.    Whether the District Court's denial of Emerson's JMOL on obviousness should be reversed where the asserted claims of the patent-in-suit are no more than combinations of known elements that yield predictable results?

## ISSUES ON APPEAL

In addition, this brief will establish the following with respect to the issues raised by Appellant:

1.    The District Court did not clearly abuse its discretion in granting Emerson's motion in limine to exclude, as hearsay, inadmissible letters from

4814-3376-5917.5

ABT's licensees which (a) post-dated the filing of the lawsuit and (b) failed to reflect any ongoing patent marking monitoring by ABT.

2.    The District Court did not err in granting Emerson's pre-verdict JMOL at the close of ABT's case on the issue of patent marking where ABT offered no evidence of what percentage of ABT's products were marked and no evidence of consistent marking policing.

3.    The District Court did not clearly abuse its discretion in ruling that ABT was permitted to seek damages on limited sales data where ABT rested its case without introducing any evidence of sales of the accused products, and where, in exchange for being permitted to reopen its case, ABT offered to stipulate to limit potential damages to only those sales reflected on a single chart shown to the jury.

4.    The District Court did not err when it determined that a decision on the objective prong of willful infringement during the pre-suit period was futile because there were no sales upon which damages were awarded prior to the filing date of the lawsuit.

4814-3376-5917.5

## STATEMENT OF THE CASE

This is an appeal and cross-appeal of a lawsuit alleging infringement of U.S. Patent No. 5,547,017 ("the '017 patent").[1]  A110.  Armin Rudd is the inventor of the patent-in-suit.  A5048.  He assigned it to the University of Central Florida, his employer at the time of the invention, which then licensed it to ABT, a business owned by Mr. Rudd.  *Id*.  ABT is in the business of licensing Mr. Rudd's patents, including the '017 patent.  A5048-A5049.

The White Rodgers division of Emerson manufactures various products including thermostats.  A5686.  The products involved in this lawsuit include several models known as the Big Blue thermostats, because of their large blue screen.  A5698-A5699.  The Big Blue thermostats had many features, one of which was called the Comfort Circulating Fan Feature ("CFF").  A5726-A5729, A5733-A5739, A5741-A5742, A6786-A6796, A6799-A6810.  It is the CFF that was accused of infringing the patent-in-suit.  A106.

The '017 patent claims a thermostat that causes the system fan of a forced-air system to operate periodically when there is no call for heating or cooling, where the periodic operation began a set period of time after the end of the last call for heating or cooling.  A121.

---

[1] The Complaint also asserted U.S. Patent Nos. 5,881,806, A123, which was dropped early in the litigation, and 6,431,268, A135, on which ABT filed a Covenant Not To Sue, A2472, on the eve of trial.

7

The jury found the '017 patent infringed and not invalid, awarding damages of $2.25 per thermostat on sales of 138,391 thermostats. A3337-A3338. The number of thermostats on which damages were awarded was stipulated to by the parties and included in the jury instructions and verdict form. A3323, A3337. The jury was advised that 138,391 Big Blue thermostats were sold from the filing date of the lawsuit until April 30, 2011. *Id*. The stipulation was requested by ABT after it rested its case without providing evidence of the sales volumes of the accused Emerson thermostats. A5669-A5677.

The jury also found Emerson's infringement prior to the filing of the lawsuit to be willful. A3339. However, the District Court subsequently ruled, after a motion by ABT, that Emerson could not be a willful infringer because no damages were awarded pre-suit. A86. The jury found that the infringement after the filing of the lawsuit was not willful. A3340.

## STATEMENT OF FACTS

## I.    THE TECHNOLOGY

The '017 patent claims a typical forced air heating, ventilating, and air conditioning ("HVAC") system with a control, such as a thermostat, that causes the fan to operate periodically when there is no call for heating or cooling, and where the periodic operation begins a set period of time after the fan stops

4814-3376-5917.5

operating at the end of the call for heating or cooling.  A109, A116, col. 1, l. 22-53.

The only asserted independent claim, claim 1, reads as follows:

> A fan recycling control apparatus for a central air conditioning (CAC) system comprising:
> a circulating fan;
> a central air conditioning system with ducts to distribute cooled and heated conditioned air throughout a building;
> a thermostat for activating and deactivating both the central air conditioning system and the circulating fan;
> said activating causing a continuous fan operation, said deactivating causing no fan operation, said thermostat further having a selectable constant fan mode, and
> a recycle control for periodically activating and deactivating only the circulating fan after a preselected time period, since the central air conditioning system has been deactivated, or the circulating fan has been deactivated from the selectable constant fan mode.

A121, col. 1, l. 23-col. 2, l. 8.

The application that resulted in the '017 patent was filed January 5, 1995. A5592.  The '017 patent issued on August 20, 1996.  A110.  After reexamination of the '017 patent, the asserted claims were amended.  A121.  The certificate following reexamination issued on November 28, 2000.  A120.

A typical prior art thermostat for a forced-air system turned the fan on when there was a call for heating or cooling.  A116.  When the system was in "auto," the fan stopped running when there was no call for heating or cooling.  A6847.  Many prior art thermostats also had a setting for continuous operation, which caused the

9

fan to run whether or not there was a call for heating or cooling. A5227-A5230. As such, the claimed invention differentiated itself from prior art by the "recycle control" element. A116.

The prior art of record contains several relevant patents. In 1935, U.S. Patent No. 2,013,136, issued to Frank Cornelius. A6813-A6824. The Cornelius patent claimed a thermostat that had the ability, when there was no call for heat, to cause the fan of the system to cycle on and off, to circulate the air. A6819. The Cornelius patent also explained that the purpose of his invention was "to intermittently start and stop" the fan when there was no call for heat, in order to "circulate air within the house." A6823, left col., ll. 23-42.

> The chief purpose of the timing device 111 is to intermittently start and stop the blower motor 14 for ventilating a room or rooms when the room thermostat 110 does not call for heat. … There are many nights when the furnace would not operate as the house would not cool to this temperature. However, the timing device, by operating the blower motor at predetermined intervals, will circulate air within the house. … In this way a room condition is maintained that is desirable from the standpoint of temperature, air motion and cleanliness.

*Id.*

In 1960, U.S. Patent No. 2,953,908 was issued to Dan Petrone, for an air cooling system. A6825-A6829. The Petrone patent claims a control for the fan of a forced-air cooling system. The fan stops when the call for cooling ends, and then there is a delay before the fan begins to operate independent of the call for cooling.

10

A6828-A6829.   The delay permits water to drain from the coils rather than be blown into the area to be cooled.  A6827, col. 4, ll. 8-17.

In 1991, U.S. Patent 5,020,332, for methods of controlling the operation of an air conditioner, issued to Eiji Nakatsuno, *et al*.  A6849.   One part of the invention of the Nakatsuno patent was a fan that operated intermittently when the compressor was not running:

> A further object of the present invention is to provide an improved drive control apparatus for the air conditioner wherein, in the event that the 24 hour air-conditioning mode is preferentially selected … with the *indoor fan driven … intermittently* to improve the comfortableness and to minimize the energy consumption.
>
> * * *
>
> As far as the intermittent operation of the indoor fan is concerned, the drive and stop of the indoor fan may be operatively associated with the drive and stop of the compressor as shown in FIG 11(a) and, alternatively, the indoor fan may be operated for a length of time $\Delta t2$  a predetermined time $\Delta t1$ after the stop of the compressor as shown in FIG. 11(b). (Even in this case, as a matter of course, the indoor fan is operated when the compressor is driven.)

A6863, col. 4, ll. 20-27, A6866, col. 10, ll. 7-15.  In other words, the fan begins to run intermittently at a predetermined time after the compressor stops.  A5113.

In 1989, U.S. Patent No. 4,838,482 issued to John Vogelzang and was assigned to Honeywell Limited ("Honeywell").  A6845-A6848.  The Vogelzang patent explained that the motivation behind that invention was to provide for

4814-3376-5917.5

movement of air and to prevent stagnation when there was no call for heating or cooling:

> During both the heating or cooling operations, there can be long periods of time when no fan operation will take place. Not only is there no movement of air in the space and possible stagnation can take place or spots in which the air may be too cool or too hot, but the air is not treated by the air treating or air cleaning apparatus.
>
> The present invention is concerned with a means for cycling the operation of the fan during periods when there is no operation of the heating apparatus or cooling apparatus.

A6847, col. 1, ll. 23-34. In other words, Vogelzang causes the fan to run periodically when there is no call for heating or cooling, just as the '017 patent claims. A5265.

A patent application filed by Paul Noto on February 22, 1995, also claimed a thermostat that caused the fan to operate periodically when there was no call for heating or cooling. A5521-A5522, A5902. Noto issued as U.S. Patent 5,582,233. A6776.

In July 1995, Honeywell began to sell a new thermostat, the PC8900, that operated in the same way claimed by the '017 patent. A5712-A5718. Mr. Rudd purchased a PC8900 and tested it on April 1, 1997, to determine if it infringed the '017 patent. A6784-A6785. Mr. Rudd connected his PC8900 to the air conditioning system in his home and timed the operation of the fan during periods

12

after the end of the call for heating or cooling. *Id.* Mr. Rudd determined that the fan of the PC8900 turned off with the end of the call for heating or cooling, began to run approximately 20 minutes after the end of the call for heating or cooling, ran for approximately 10 minutes, and then turned off for 20 more minutes. *Id.* The periodic fan operation repeated itself until there was another call for heating or cooling. *Id.* Based on this testing, Mr. Rudd determined that the PC8900 infringed his '017 patent. *Id.* In other words, he determined that the fan ran periodically when there was no call for heating or cooling, and the periodic operation began a preselected period of time from the end of the heating or cooling.

## II.    MR. RUDD'S INVENTION

According to Mr. Rudd, some evenings he noticed that, when it was cool outdoors, his air conditioning system did not run at all. A5060-A5062. Because there was no call for cooling, the system fan did not run, and when the door was closed, his bedroom became stuffy. *Id.* He decided that using the fan to circulate air would solve the problem, but he did not want to use the energy needed to run the fan constantly. A5064-A5066. Mr. Rudd's solution, and the basis of his invention, was to have the fan run intermittently during periods when it otherwise would not operate. A5060-A5064, A5231, A5235, A5099.

Additionally, because the fan runs with the call for heating or cooling, there was no need for a fan to circulate and mix air until the fan had been off for a period

13

of time. *Id*. As such, Mr. Rudd included a pause or "off time" after the call for heating or cooling ended until the periodic fan operation began. A5283, A5285-A5287.

Mr. Rudd acknowledged that there is another reason to build a pause into the fan operation after the call for heating or cooling ends and before periodic fan operation begins. In a humid climate, once the system fan for the air conditioner stops running, water begins to form on the coils. A5282-A5284. If the fan is turned right back on, the water on the coils is blown back into the residence, increasing the humidity indoors. *Id*. Mr. Rudd conceded that this was known long before he filed the application that became his '017 patent. A5286. Mr. Rudd also admitted that it was well known years before the filing of the '017 application that the fan ran when there was a call for heating or cooling, thereby mixing and circulating the air. A5285-A5287. As a result, at the time of Mr. Rudd's "invention," it was long known that the air was well mixed at the time the fan stopped operating, and there was no need to run the fan for a period as there would not be hot or cold spots or stagnant air.

## III.    EMERSON'S PRODUCTS

Emerson's accused products are generally known as the Big Blue thermostats and were introduced in 2006. A6786-A6787, A6788-A6789, A6790-A6793, A5721-A5722, A5740. The Big Blue thermostats were sometimes referred

14

to by their model numbers, "1277" for example, during trial.  A5721-A5722.  The accused feature was referred to as the CFF or Comfort Circulating Fan Feature.  A5740, A6799-A6810.

## IV.  MARKING

Some, but not all, of the licensees of the '017 patent were required to mark their licensed products with the '017 patent number.  A5192.  Some of the licensees did not mark as required.  A5194-A5195.  The largest licensee, Honeywell, was not required to mark – and did not mark – its products with the patent number, as Honeywell negotiated that term in the license.  A5192, A5194-A5195.  Honeywell was ABT's largest licensee, by far, paying ABT $130,000 in royalties for the ability to sell $11 million worth of licensed products.  A5216-A5218.  In addition to the units sold by Honeywell, ABT had additional licensees whose sales were a fraction of Honeywell's.  A5210.

During the pendency of this lawsuit, Mr. Rudd sent letters to some of his licensees asking whether they marked their products with the '017 patent.  A1920.  ABT attempted to use the responses to these letters as proof of marking.  A5071-A5073.  Prior to filing this lawsuit, Mr. Rudd did not send correspondence to the licensees in any systematic fashion.  A5071.  The correspondence showed that only one letter from each licensee was presented.  A1904-A1914.  Additionally, trial testimony by Mr. Rudd did not provide sufficient evidence that the licensees

15

marked their products with the '017 patent prior to the filing of this lawsuit. A5193-A5195.

## V.    DAMAGES

ABT failed to introduce evidence of Emerson's sales volumes and revenue for the Big Blue thermostats before resting its case. In its brief at pages 23-29, Appellant blames its failure on Emerson, but cites no evidence in support of that argument. Appellant's brief is based entirely on attorney argument, along with post-trial calculations by Appellant's damages expert witness, Mr. Cromley.

As the transcript shows, Emerson made a motion for JMOL on the issue of damages on February 14, 2013, after ABT rested its case. A5605-A5606, A5609. ABT responded that Mr. Cromley, its damages expert, had calculated the damages, and they were higher than suggested. A5630. When reminded by the District Court that arguments are not evidence, ABT did not even attempt to argue that there was actual evidence of sales, and instead suggested that the jury simply decide a royalty rate, and that rate could be applied to the sales figures later. A5630-A5631. When reminded again by the District Court that there was no evidence of damages, ABT argued only that the information was in Mr. Cromley's report. When advised yet again that the Cromley report was not evidence, ABT responded with "Okay. Understood." A5631-A5632. At no time did ABT argue that it did not have the sales and revenue information from Emerson.

16

The District Court then dismissed the jury for the day and permitted the parties to brief the issues raised by Emerson.  A5632-A5633.  The next morning, the District Court permitted further argument on Emerson's motions for JMOL. ABT argued that a chart in the Cromley report identified as Figure 8 had been seen by the jury, and the jury could estimate sales from that chart.  A5671-A5673.  The District Court refused to follow ABT's suggestion, asking how the portion of sales for 2009 could be calculated, and whether damages could just be guessed.  *Id*.  In response, ABT stated "No.  Make it zero.  Don't use it."  A5671-A5672.  The District Court again asked ABT whether it was suggesting that the jury only look to 2010 and the first seven months of 2011, to which ABT responded, "Correct ...." A5673.

The District Court, accepting ABT's offer, then stated that "in this instance I am going to find that there is sufficient evidence of the damages, coupled with the Plaintiffs' suggestion and agreement that it would not be seeking any damages for what is shown on Figure 8 for the year 2009."  A5674.  The District Court then stated "I am going to permit the Plaintiff to reopen the case solely for the purpose of marking Figure 8 and placing it into evidence.  And as I said, that is being – that is part and parcel of Plaintiffs offer not to seek damages with respect to 2009 because that would be based wholly on speculation."  A5675.  The District Court then acknowledged that by doing so, the figures would not be "so fatally defective

that the Defendant would be entitled to judgment as a matter of law." *Id*.

After the jury was discharged, ABT filed a motion to reopen the damages case on March 7, 2013. A3343-A3345. In its motion, ABT attempted to challenge its prior stipulation by arguing that the jury was improperly instructed on the number of infringing sales. *Id*. ABT also complained about the timing and clarity of Emerson's production of sales data. *Id*. The District Court rejected ABT's arguments and denied its motion. A17-A19.

Specifically, in denying ABT's motion, the Court stated:

> The Court agrees with Defendant that Plaintiffs' realization that they should have done things differently during trial does not provide the Court with a basis to reopen the damages case two weeks after the jury returned its verdict. Plaintiffs had ample opportunity prior to trial to seek relief with regard to any tardy disclosures. If Defendant's sales evidence was not clear, the time to clarify it was before or even during trial, not after the jury returned its verdict. In none of the cases cited by Plaintiffs did a court reopen a case for additional evidence on damages, after the jury had been discharged. Nor have Plaintiffs cited a case in which Rule 60(b) was applied in a context similar to the one here.

A19.

## VI. THE JURY'S WILLFULNESS FINDING

One of the issues the jury was asked to decide was whether ABT had proven by clear and convincing evidence that Emerson's alleged infringement was willful. A3302. In Jury Instruction 28, the jury was instructed regarding "Willful Infringement – Generally." A3330. Thereafter, the jury was asked, by way of a

18

special interrogatory, whether ABT proved by clear and convincing evidence that Emerson's infringement of the '017 patent was willful from the Fall of 2006 to the lawsuit filing date of November 5, 2009. A3339. In response to this question directed to the subjective prong of the willfulness inquiry, the jury answered "YES." *Id.* The jury concluded that Emerson's infringement after the filing of the lawsuit was not willful. A3340.

After the jury was discharged, ABT filed a motion on May 23, 2013, requesting that the District Court address the objective prong of the willfulness inquiry for the pre-suit period. A86. The District Court denied ABT's motion, finding that "enhanced damages for pre-lawsuit willfulness would not be appropriate in this case, as [ABT was] not awarded any damages, and there was no finding that there were infringing sales, for that period of time." A13. The District Court went on to note that ABT did not cite any cases, nor did the District Court locate any authority permitting enhanced damages under 35 U.S.C. § 284 where no damages were awarded. *Id.* The District Court concluded that it was "not in a position to make findings of pre-lawsuit infringement, and to determine the number of pre-lawsuit infringing sales, if any, both of which would be necessary to award enhanced damages for the pre-lawsuit period." *Id.*

19

## SUMMARY OF THE ARGUMENT

This Court should affirm-in-part and reverse-in-part the decision of the District Court and jury.

The District Court erred in the determination that the '017 patent was not obvious. The '017 patent claims are nothing more than a standard thermostat with the added feature of intermittent fan operation a predetermined time after the heating or cooling stopped. But the unrebutted evidence shows that this was well known in the art. Intermittent fan operation when there was no heating or cooling was taught in numerous prior art references as a way of breaking up air stagnation and improving heating or cooling efficiency. And it was known to wait until some time after the heating or cooling stopped to avoid blowing condensation back into the room, and because there was no need for fan operation immediately after the heating or cooling stopped. The evidence at trial showed that these features were familiar, that they were combined in known ways, and that they would yield predictable results. There was no reasonable basis on which the jury could have found the '017 patent not invalid.

The District Court properly determined that the letters relied upon by ABT were improper hearsay and were not subject to the business records exception to the hearsay rule, as they were prepared solely for litigation. The District Court

20

also properly determined that the evidence of marking introduced at trial failed to show substantially consistent and continuous marking.

The marking issue related to ABT's ability to claim damages for any infringement that occurred prior to the filing of this lawsuit. ABT failed to provide evidence of substantially consistent and continuous marking prior to the filing of the lawsuit. Significantly, ABT's largest licensee, Honeywell, was not required to, and did not mark its licensed products. The other evidence proffered consisted of inadmissible hearsay, and less than credible testimony that Mr. Rudd did some limited evaluation of licensed products at tradeshows. The District Court ruled that ABT failed to show substantially consistent and continuous marking.

The District Court's ruling on damages was also correct and not a clear abuse of discretion. ABT rested its case without introducing any evidence of the scope of Emerson's sales of the Big Blue thermostats at the relevant times. After being permitted to brief the issue, ABT then suggested that it would be willing to accept damages based on a shortened period of time, as shown on a chart that was visible to the jury, but not discussed. The District Court offered to let ABT re-open its case for the limited purpose of introducing the chart containing the number of Big Blue thermostats sold between the filing of the complaint and April 30, 2011, based on ABT's agreement that it would not seek any damages outside this period. ABT should not be permitted to withdraw from the very agreement that it

21

suggested, and that prevented it from losing the entire lawsuit just after resting its case.  As the District Court properly found, "[ABT's] realization that [it] should have done things differently during trial does not provide the Court with a basis to reopen the damages case … after the jury returned its verdict."  A19.

The District Court was also correct in determining that the issue of the objective prong of willfulness was moot in light of the fact that there were no damages awarded during the time that the jury found Emerson to be a willful infringer.

## ARGUMENT

## I.    STANDARDS OF REVIEW

When the prior art references demonstrate an invention to have been obvious, a jury's obviousness determination may be reversed.  *See Richardson-Vicks, Inc. v. Upjohn Co.*, 122 F.3d 1476, 1479 (Fed. Cir. 1997) ("[I]n re-creating the facts as they may have been found by the jury, and in applying the *Graham* factors to the case, … the record evidence [is assessed] in the light most favorable to the verdict winner . . ., though this does not mean that … [the Court is] free to abdicate [its] role as the ultimate decision maker on the question of obviousness."). More specifically, "[w]hen reviewing a district court's JMOL determination as to obviousness, this Court reviews a jury's conclusions on obviousness, a question of law, without deference, and the underlying findings of fact, whether explicit or

implicit within the verdict, for substantial evidence." *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1338 (Fed. Cir. 2008) (quoting *Dippin' Dots, Inc. v. Mosey,* 476 F.3d 1337, 1343 (Fed. Cir. 2007)). These underlying factual findings, in turn, include the *Graham* factors: the scope and content of the prior art, the differences between the prior art and the claims at issue, the level of ordinary skill in the pertinent art, and secondary considerations, otherwise known as objective indicia of non-obviousness. *Finisar Corp.*, 523 F.3d at 1338-39 (citing *Graham v. John Deere Co.,* 383 U.S. 1, 17-18 (1966)). While a jury may render a decision on a question of obviousness when it is considering any underlying fact questions, obviousness is ultimately a question of law that this Court must review *de novo*. *Boston Sci. Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 990 (Fed. Cir. 2009).

For issues not unique to patent law, the law of the regional circuit in which this appeal would otherwise lie should apply. *Finisar Corp. v. DirecTV Group*, *Inc.*, 523 F.3d 1323, 1328 (Fed. Cir. 2008). Thus, when reviewing evidentiary rulings and grants (or denials) of motions for JMOL, this Court should look to Eighth Circuit law.

With respect to evidentiary issues, within the Eighth Circuit, review of evidentiary rulings is "highly deferential." *Guyton v. Tyson Foods, Inc.*, No. 13-2036, 2014 U.S. App. LEXIS 16278, at *15 (8th Cir. Aug. 25, 2014). The Eighth

23

Circuit reviews a district court's evidentiary rulings for a clear abuse of discretion. *United States v. Pirani*, 406 F.3d 543, 555 (8th Cir. 2005) (*en banc*).

With respect to motions for JMOL, within the Eighth Circuit, a grant of a JMOL motion is appropriate if "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue. . . ." Fed. R. Civ. P. 50(a). In considering a motion for JMOL, the Eighth Circuit has instructed that a court must draw "all reasonable inferences in favor of the nonmoving party without making credibility assessments or weighing the evidence." *Penford Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 662 F.3d 497, 503 (8th Cir. 2011) (citation omitted). "To sustain an entry of judgment as a matter of law, '[t]he evidence must point unswervingly to only one reasonable conclusion.'" *Id*.

## II. EMERSON SHOULD PREVAIL ON ITS CROSS-APPEAL THAT THE PATENT-IN-SUIT IS INVALID AS OBVIOUS

Every element of the asserted claims of the '017 patent is disclosed in combinations of related prior art that a person of ordinary skill would be motivated to combine. The combinations lead to anticipated results, and thus, the claims are invalid as obvious.

The invention protected by the '017 patent is a typical prior art thermostat with two additional features, both of which are also found in the prior art: (1) a fan that operates periodically between the calls for heat or cooling, and (2) the periodic

fan operation begins a preselected time following the end of the call for heating or cooling. Prior art thermostats – such as those in Cornelius, Vogelzang, and Nakatsuno – also caused the fan to operate periodically between the calls for heat or cooling. Prior art thermostats such as Petrone and Nakatsuno also caused the fan to begin to operate at a preselected time following the end of the call for heating or cooling.

In particular, in addition to the disclosures of Cornelius, Nakatsuno, and Vogelzang alone to show obviousness, combining the known elements from any one of Cornelius, Nakatsuno, and/or Vogelzang with Petrone would lead a person of ordinary skill in the art exactly to the purported Rudd invention. These combinations would have been readily apparent to a person of ordinary skill in the art who would have known how to combine them and would have been motivated to do so.

A person of ordinary skill in this case would be somebody familiar with HVAC and the controls that use them; somebody who had an engineering degree or appropriate amount of equivalent experience and had some additional experience in working in the field. A5839.

The undisputed facts of record show that the independent and dependent asserted claims of the '017 patent – claims 1-5 – are nothing more than an obvious variation of the prior art. In fact, Mr. Rudd admitted that if independent claim 1

25

was obvious, all of the dependent claims were also obvious. The asserted claims of the '017 patent, as a matter of law, are obvious. ABT's scant, if any evidence of secondary indicia of non-obviousness is irrelevant and does not change the result. ABT provided no proof of nexus between these secondary considerations and the inventions claimed in the '017 patent.

A.    **The '017 Patent Is Obvious Because It Consists Of Prior Art Combinations That Do No More Than Yield Predictable Results**

A patent may not be obtained for an invention that would have been obvious at the time of the invention. 35 U.S.C. § 103(a). An obviousness analysis involves an examination of the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill in the pertinent art. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406-07 (2007) (citing *Graham*, 383 U.S. at 17-18)

In *KSR*, the Supreme Court particularly emphasized "the need for caution in granting a patent based on the combination of elements found in the prior art," and explained that "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* at 415-16. The Supreme Court stated that "when a patent simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious." *Id.* at 417 (citations omitted). When determining the

26

obviousness of a combination of known elements, the operative question is whether the combination is merely "the predictable use of prior art elements according to their established functions." *Id.*

The invention claimed in the '017 patent is just the combination of prior art thermostats with fans that cycle when there is no call for heating or cooling, such as Cornelius, Nakatsuno, and Vogelzang, and thermostats that cause the fan to pause at the end of the call for cooling, such as Nakatsuno and Petrone.

## B.    Claim 1 Of The '017 Patent Is Obvious

Claim 1 discloses a control for a central air conditioning system with a fan, ducts, a thermostat, and a "recycle control." A121. This recycle control is described as follows:

> a recycle control for periodically activating and deactivating only the circulating fan after a preselected period, since the central air conditioning system has been deactivated, or the circulating fan has been deactivated from the selectable constant fan mode.

*Id.* This element of claim 1 recites both the periodic fan operation found in the prior art thermostats as well as the pause or "off time" in fan operation after the end of the call for heating or cooling, which is also found in prior art thermostats.

Mr. Rudd testified that it was well known before his invention that the fan in a forced-air HVAC system moved and circulated the air. A5285-A5286. He also testified that because the fan ran during a call for heating and cooling, at the end of

27

a call for heating and cooling, the air would be mixed and circulated. *Id.* As such, there would be no need for additional fan operation at that time. That was known before the invention of the '017 patent, and it was the reason Mr. Rudd put a pause in the fan operation before it began to operate periodically. A5287.

Mr. Rudd also testified that it was known in the prior art that if the fan of a forced-air cooling system ran right after the call for cooling ended, the fan would blow moisture back into the building, which would be undesirable. A5282-A5285.

In other words, Mr. Rudd admitted that it was known before his invention that the fan of a forced air system circulated and mixed the air – which is what the fan of his '017 patent did. He admitted that there was a benefit to be gained by causing the fan operation to pause after the end of the call for cooling, and this was known in the prior art. Additionally, he admitted that it was known that having the fan run periodically would use less energy than having the fan run constantly. His admissions show that all of the elements of his "invention" were well known in the prior art and obvious combinations of prior art patents.

In Cornelius, Nakatsuno, and Vogelzang, just as in claim 1 of the '017 patent, the periodic fan is used to move or circulate air to keep the air in the space uniform. Cornelius states that the timer operates the fan at predetermined intervals to maintain a desirable temperature. A6823. Nakatsuno states that the fan can be run intermittently to improve comfort and conserve energy. A6864. Vogelzang

28

indicates that cycling the fan can move the air throughout the space to prevent stagnation when there is no call for heating or cooling.   A6845.   Much like Cornelius, Nakatsuno, and Vogelzang, the '017 patent states that the control periodically operates the fan to mix and condition the air and average the temperature when the system is not heating or cooling.   A116.   The operation of a temperature control and fan using the technology of these four patents was explained at trial using the illustration below.



Dr. Sherman is Emerson's expert on this technology, and he testified

regarding the obviousness of the '017 patent. A5827-A5855, A5872-A5968. He runs the residential building systems group at Lawrence Berkeley National Laboratory. A5828. In viewing this chart, Dr. Sherman testified that both Vogelzang and the '017 Rudd patent address the exact same problem. Both stir the air in the same manner and achieve the same objective. A5874-A5876. According to Dr. Sherman, the Rudd patent is obvious in light of Vogelzang because a person of ordinary skill in the art would start the periodic fan function off when using the Vogelzang technology because the fan has just been running. A5875-A5876.

Similarly Dr. Sherman testified that both Cornelius and the '017 Rudd patent resolved the same issue of air stuffiness with the same solution, period fan operation. A5878-A5883. He stated that this chart correctly reflected the operation of both Cornelius and Rudd. A5881-A5882. Because there are no significant differences between them, Rudd is obvious in view of Cornelius. A5882-A5883.

Dr. Sherman also testified that this chart reflects the operation of Nakatsuno, as fan cycles will occur if more time is added. A5886-A5888. As a result, Rudd is obvious in view of Nakatsuno. A5888.

The pause in fan operation after the end of the call for heating or cooling is the same in prior art patents such as Petrone and Nakatsuno, A6855, A6864, as it is in claim 1 of the '017 patent. In each, the fan stops running when the compressor

stops, and then, while the compressor is still off, and after a set or preselected time, the fan begins to run again. *Id.* The operation of a heating or cooling system and a fan using these three patents was explained at trial using the illustration below.



Neither the operation of the prior art periodic fan nor the operation of the prior art pause in fan operation changes in any way when they are combined together to form the invention claimed in claim 1 of the '017 patent. More specifically, Nakatsuno on its own, or the combination of the periodic fan disclosed in references such as Cornelius or Vogelzang with the pause in fan operation as described in Petrone, results in exactly what a person of ordinary skill in the art would anticipate: a fan that pauses for a set time at the end of the call for

31

heating or cooling before it begins its periodic operation. "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR*, 550 U.S. at 416. "[W]hen a patent simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious." *Id.* at 417 (internal quotations omitted).

Similarly, a person of ordinary skill in the art would be motivated to combine the periodic fan of the prior art with the prior art timer that begins with a pause or an "off time." According to Cornelius, the purpose of the periodic fan was to circulate air when there was no call for heat, and just as Mr. Rudd testified, this would be useful at night when the fan might not otherwise run:

> The chief purpose of the timing device 111 is to intermittently start and stop the blower motor 14 for ventilating a room or rooms when the room thermostat 110 does not call for heat. … There are many nights when the furnace would not operate as the house would not cool to this temperature. However, the timing device, by operating the blower motor at predetermined intervals, will circulate air within the house … In this way a room condition is maintained that is desirable from the standpoint of temperature, air motion and cleanliness.

A6819, Cornelius, p. 5, left col., ll. 23-42, A5879-5880.

Mr. Vogelzang had a similar motivation for his invention:

> During both the heating or cooling operations, there can be long periods of time when no fan operation will take place. Not only is there no movement of air in the space

and possible stagnation can take place or spots in which the air may be too cool or too hot, but the air is not treated by the air treating or air cleaning apparatus.

The present invention is concerned with a means for cycling the operation of the fan during periods when there is no operation of the heating apparatus or cooling apparatus.

A6847, Vogelzang, col. 1, ll. 24-34, A5872-5873.

If a person of ordinary skill in the art was assembling a system control, such as a thermostat, with the prior art periodic fan of Cornelius or Vogelzang, that person would cause the fan to operate periodically after the call for heating or cooling ended. In order to do that, the person of ordinary skill in the art would have to decide when the periodic fan would begin to operate. Both prior art patents disclose a fan that runs constantly when there is a call for heating or cooling, and periodically when there is no call for heating or cooling. Neither of these references indicates when the fan should begin its periodic operation. However, in both Cornelius and Vogelzang, after the call for heating or cooling ends and the fan stops its constant operation, a signal is needed to cause the fan to begin to run periodically. A5929. This provides the motivation to combine the periodic fan with something to send a signal, such as the timer in both the Cornelius and Vogelzang inventions. A5931-A5933, A5936-A5938.

Additionally, such a timer sends the signal in the Nakatsuno control, which causes the periodic fan operation:

33

As far as the intermittent operation of the indoor fan is concerned, the drive and stop of the indoor fan may be operatively associated with the drive and stop of the compressor as shown in FIG. 11(a) and, alternatively, the indoor fan may be operated for a length of time Δt2 a predetermined time Δt1 after the stop of the compressor as shown in FIG. 11(b). (Even in this case, as a matter of course, the indoor fan is operated when the compressor is driven.)

Nakatsuno, A6866, col. 10, 11. 7-15.



A6849, Nakatsuno, col. 10, ll. 7-15, Figs. 11(a) and 11(b). Dr. Sherman testified that Fig 11(b) of Nakatsuno reflected intermittent fan operation, and would show that if the horizontal line showing time was extended. A5884-A5886. ABT's expert, Dr. Siegel, conceded that the word "intermittent" in Nakatsuno meant "more than once." A6235.

    Various types of timers were available in the prior art to begin the periodic

34

fan operation after the call for heating or cooling ended.  A5937-A5941.  Once periodic fan was selected, the fan could either start "on" or "off" immediately after the call for heating or cooling ended.

Mr. Rudd admitted that it was known in the prior art that there were two benefits associated with using a timer that caused the fan to pause, or start in an off time after the end of the call for heating or cooling, before the periodic fan operation began.  One benefit was that such a timer selection would reduce energy needs.  There would be no fan operation when the fan has just been running and the air is mixed, and this avoidance of unnecessary fan operation would save energy.  The second benefit was that causing a pause before the periodic fan operation in a cooling system would provide time for humidity to drop from the coils, rather than being blown right back into the building.  A5282-A5287.  There was no testimony of any benefits associated with any other timing for the fan.

This second benefit was recognized in Petrone:

> It is accordingly a major object of the present invention to provide in an air conditioning system means permitting moisture on the cooling coil to drain away when the cooling unit is shut down rather than to be supplied into the cooled region and thereby avoid undesirably increasing the relative humidity.

> Another object of this invention is to provide an air conditioning system wherein a compressor is operated intermittently and air is forced across the cooling coils substantially continuously with means for interrupting forced air flow across the cooling coils when the

35

compressor is shut down to permit moisture drainage from the cooling unit rather than re-evaporation of the moisture into the air of the system.

Still another object of the invention is to provide in an air conditioning system switch means effective to de-energize both the compressor and blower motors in response to the temperature of cooled region and a time delay means effective to re-energize the blower motor only after a period sufficient to permit moisture drainage from the cooling unit.

A6826, Petrone, col. 1, l. 68-col. 2, l. 11. A5888-A5891.

Mr. Rudd admitted that because the fan operates and circulates the conditioned air during the entirety of any call for heating or cooling, there is little, if any, need for the fan to circulate the air immediately after the call for heating or cooling has ended as the air is already mixed. A5287. Dr. Sherman agreed. A5875. Instead, the periodic fan should not be triggered until there is a need for circulation, which also saves on energy. As Mr. Rudd and Dr. Siegel, ABT's expert, repeatedly testified, the control claimed in the '017 patent is "smart" and does not run when it is not needed. A5062-A5064, A6204-A6205. There is only one way to accomplish these goals – combining the prior art patents that disclose a fan that operates periodically when there is no call for heating or cooling, and the prior art patents that disclose such a fan that begins to run or run periodically. This obvious combination results in the "invention" of the '017 patent.

**C.    The District Court Erred In Determining That There Was Sufficient Evidence To Uphold The Verdict On Obviousness**

In denying Emerson's motion for JMOL on the issue of invalidity, the District Court incorrectly set forth three "facts" that the jury could have found to show nonobviousness, based on the evidence. A96-A102, A4802. There was not substantial trial evidence to support any of the three "facts."

First, the District Court held that "[t]he jury could have reasonably found, based upon the evidence, that the prior art relied upon by Defendant did not disclose 'periodic' fan operation that was dependent upon the deactivation of the heating or cooling function of the system…." A4208. There was not substantial evidence to support this finding. As shown above, Cornelius, Nakatsuno, and Vogelzang all disclosed periodic fan operation that began only after the end of the heating or cooling function of the system. As such the periodic fan operation was entirely dependent on the deactivation of the heating or cooling function of the system. If the heating or cooling function of the system did not stop, the periodic fan operation would not take place. There was no prior art in evidence in which the periodic operation of the fan was **not** dependent on the deactivation of the heating or cooling function of the system.

Additionally, Petrone disclosed a control that caused the system fan to stop with the end of the cooling system, pause, and then restart the fan of the system

37

without restarting the cooling. Here, too, the fan operation was triggered by, and dependent on, the end of the heating or cooling function.

The fan operation in all of the prior art cited by Emerson depended upon the fan operating periodically only after the end of the call for heating or cooling. There was no evidence to the contrary, and no evidence that supports the District Court's holding or the jury's verdict.

Second, the District Court also held that the jury could have reasonably found that "the prior art relied upon by Defendant … was not adaptable to modern air conditioning systems." A4208. There was not substantial evidence to support this finding. Even if a reasonable jury could have found this regarding Cornelius, which is from the 1930s, the relevant features were also disclosed in Nakatsumo and Vogelzang, which are indisputably modern. Both Nakatsuno and Vogelzang disclosed the use of a thermostat to cause the fan to run periodically when there was no call for cold in an air conditioning system. Nakatsuno, A6849, described the system that needed his invention as "once the air-conditioning is suspended in the manner hereinabove described, the temperature in the room to be air-conditioned will increase …." A6863, col. 3, ll. 3-5. There was no evidence that the 1991 air conditioner disclosed in Nakatsuno was anything other than a modern air conditioning system.

Similarly, Vogelzang, titled "Air Conditioning System With Periodic Fan Operation," issued in 1989. The abstract of the Vogelzang patent explains the invention as one that can operate in a cooling system:

> The space thermostat has a switch connected through a fan cycler to provide for cycling the fan independent of the operation of the heating and/or cooling apparatus to periodically move air through the air treatment apparatus and throughout the space to insure that the air is periodically treated and moved throughout the space to prevent stagnation when there is no call for operation of the heating and/or cooling apparatus.

A6845. Vogelzang clearly calls out the use of the invention in a cooling system. As the patent issued in 1989, there is nothing to suggest that the cooling systems disclosed are anything other than "modern air conditioning systems."

There was no evidence presented to the jury that made any indication that the prior art would not work with an air conditioning system, and no evidence that supported the District Court's holding or the jury's verdict.

Third, the District Court found that the jury could have found that there was a long-felt need for a periodic fan recycle control as disclosed in the Rudd patent. A4208. There was not substantial evidence to support this finding. While ABT did introduce testimony from Joseph Lstiburek, Mr. Rudd's business partner and friend, A5388, that testimony did not prove the claimed long-felt need. Mr. Lstiburek admitted that in reaching his conclusion he made no effort to review any prior art patents to the '017 patent. A5392-A5393. Additionally, there was no

39

testimony that tied the claimed long-felt need to the patented feature of the '017 patent. Nor could there be, as the prior art operated in the same way to achieve the same result.

Because the District Court based its decision on these three misunderstandings, the District Court erred in determining that a reasonable jury could have found the '017 patent not obvious.

### D.   Emerson's Evidence Of Near-Simultaneous Invention By Others Supports An Obviousness Finding And Was Improperly Ignored By The District Court

Evidence of near-simultaneous invention by others is relevant to whether the asserted patent claims are obvious. *See, e.g.*, *Monarch Knitting Mach. v. Sulzer Morat GmbH*, 139 F.3d 877, 883 (Fed. Cir. 1988). Emerson's evidence that there were others who created a system just like Mr. Rudd's system – Vogelzang, Honeywell's PC8900, Nakatsuno, and Noto – at about the same time, was not challenged by ABT. A5901-A5903. However, in ruling on Emerson's JMOL, the District Court failed to acknowledge or give weight to this critical evidence. A4208-A4209.

### E.   ABT Failed To Raise Any Relevant Evidence To Contradict An Obviousness Finding

ABT offered no relevant evidence to challenge an obviousness finding. In fact, Mr. Rudd's own testimony strongly supports such a finding. Mr. Rudd admitted that every element in his '017 patent was found in the prior art, and that

40

the operation of those features was the same in the prior art as it was in the '017 patent.  A5256-A5270.  Mr. Rudd also provided the motivation to combine the features:  air could get stagnant when there was no fan operation; constant fan operation was not needed and used too much energy, so periodic or intermittent fan operation was a middle ground; there was no need to have the fan run right after the call for heating or cooling ended, as it had just mixed the air; and beginning the periodic operation with "fan off" permitted moisture to drain from the coils when the system was cooling.  A5282-A5287.

The relevant inquiry is whether a person of ordinary skill in the art would have combined the references.  *See, e.g.*, *Bayer Healthcare Pharms., Inc. v. Watson Pharms., Inc.,* 713 F.3d 1369, 1375 (Fed. Cir. 2013).  The overwhelming and undisputed clear and convincing evidence is that he or she would have combined the references as described by Emerson, using the prior art motivation which was acknowledged by Mr. Rudd. However, the District Court in its discussion of obviousness ignored this question in its entirety in denying Emerson's JMOL.  A4208-A4209.  Indeed, the District Court did not even identify who a person of ordinary skill in the art would be, let alone why (or why not) he or she would combine the references as described by Emerson.  *Id.*

In a further attempt to establish non-obviousness, ABT offered testimony from Mr. Rudd regarding the alleged commercial success of his invention in the

'017 patent. While ABT attempted to support its non-obviousness position with this secondary consideration, it failed to provide the required nexus between the evidence and the claimed invention. *See Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1344 (Fed. Cir. 2013). More specifically, ABT failed to provide the required nexus or connection between the patented feature and the market share of any products. *In re Applied Materials, Inc.*, 692 F.3d 1289, 1300 (Fed. Cir. 2012) (concluding that commercial success is relevant to obviousness only if there is proof that the sales were a direct result of the unique characteristics of the claimed invention as opposed to the economic and commercial factors unrelated to the quality of the patented subject matter). ABT provided no evidence of the market share of thermostats or controls using the '017 patent, much less evidence that the market share is related to the claimed recycle control feature. Again, the District Court failed to address this deficiency in denying Emerson's JMOL on obviousness.

Even if the District Court were to have accepted that ABT put forth relevant evidence of secondary considerations and the proper nexus, these secondary considerations cannot, as a matter of law, defeat the overwhelming *prima facie* evidence of obviousness in this case. Thus, the District Court erred in denying Emerson's motion for JMOL. *See Agrizap, Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1344 (Fed. Cir. 2008) ("[T]he objective evidence of non-obviousness simply

cannot overcome such a strong *prima facie* case of obviousness.").

The Court's decision in *Boston Scientific* is instructive. There, as here, the jury returned a verdict of non-obviousness, and the district court denied the post-verdict motion for JMOL. *Boston Sci. Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 992 (Fed. Cir. 2009). This Court reversed, concluding that the combination was obvious, and that, "given the strength of the prima facie obviousness showing, the evidence on secondary considerations was inadequate to overcome a final conclusion that [the claim] would have been obvious." *Id*. (citations omitted; alteration in original). The Court also made clear that "[w]e are free to override the jury's legal conclusion on the ultimate question of obviousness without deference." *Id*. The jury's verdict of non-obviousness here should similarly be reversed.

## F.    The Dependent Claims Rise And Fall With Independent Claim 1

There is no question that the asserted dependent claims of the '017 patent are equally obvious. Mr. Rudd himself admitted as much. A5970, A5974-A5973. The dependent claims are merely the combination of the fan recycle control of claim 1 with various types of heating and cooling systems. A119. Indeed, Mr. Rudd conceded that, if claim 1 is obvious, then claims 2 through 5 are obvious. A5970-A5976. ABT's retained expert, Dr. Siegel, did not offer any separate analysis of those claims. In light of this, there is no evidentiary basis on which the

4814-3376-5917.5

jury could find claim 1 invalid as obvious, but uphold the validity of claims 2 through 5.

## III. APPELLANT SHOULD NOT PREVAIL ON ITS APPEAL

### A. The Evidence Does Not Support A Finding Of Substantially Consistent And Continuous Marking

ABT failed to show substantially consistent and continuous marking to establish pre-suit constructive notice. It did not meet the requirements of 35 U.S.C. § 287(a), which has been construed to require that "once marking has begun, it must be substantially consistent and continuous in order for the party to avail itself of the constructive notice provisions of the statute." *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996).

ABT attempted to introduce evidence of marking through a collection of letters sent by some licensees to Mr. Rudd shortly before trial, indicating that the authors were in purported compliance with the marking requirements of the licenses for the '017 patent. The letters were defective for many reasons: (1) there was no marking requirement at all for the largest licensee, Honeywell; (2) the letters were dated shortly before trial, and long after the relevant period; (3) the letters were sent as a response to correspondence from Mr. Rudd asking if the licensees were in compliance, not as part of a compliance program, but simply to show marking at trial; (4) there was no actual data regarding the percentage of

sales that were marked with the patent numbers; and (5) the letters were inadmissible hearsay.

### 1.    The letters from licensees were inadmissible hearsay

Only after this lawsuit was filed did Mr. Rudd send letters to some of his licensees asking if they marked their products with his patent numbers.  A1920. His intention was to use the responses as proof of marking.  A5071-A5072.  Mr. Rudd did not send correspondence to his licensees in writing before the lawsuit, in any systematic fashion.  A5071.  The correspondence showed that only one letter from each licensee was presented.  A1904-A1914.  As such, the District Court properly held that the letters did not fall within the business records exception to the hearsay rule.  A5666.

Appellant's argument that the letters are business records rests entirely on a statement that they were "part of an overall marking compliance program."  For that proposition, Appellant cites to A2190.  That citation is to a brief, and not to any evidence presented in this case.  Additionally, it is directly contradicted by the statement made by ABT during trial that Mr. Rudd did not send "systematic" correspondence about marking to his licensees until after this lawsuit was filed. A5071-A5072.

Although the letters were deemed hearsay, and not subject to the business records exception, there was nothing to prevent Mr. Rudd from attempting to lay a

proper foundation for their admission during his testimony. He did not do so, as the facts did not support it. He could not testify that the letters were ordinary business records when it was acknowledged that they were not. *Id*. Additionally, the letters themselves show that they are not business records of ABT.

Appellant argues at page 21 of its brief that the fact that the letters were written after the litigation does not automatically disqualify them as business records. This misunderstands the issue. The fact that ABT never kept such records prior to the lawsuit added to the fact that the letters were for the purpose of the litigation, means that they are not business records. As set forth in Fed. R. Evid. § 803(6)(B), in order to qualify as a business record, ABT was required to prove that "the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling.…" ABT made no such showing. Additionally, pursuant to Fed. R. Evid. §803(6)(C), ABT could have proven that the letters were business records if "making the record was a regular practice of that activity." There was no evidence to support this. ABT never even attempted to prove that it had a regular practice of contacting licensees on a schedule to determine whether or not they were marking their licensed products with the '017 patent number.

ABT must prove that the District Court abused its discretion in ruling the letters inadmissible hearsay, or the ruling will not be reversed. ABT, however,

does not point to any clearly erroneous findings or errors of law sufficient to show an abuse of discretion. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1039 (Fed. Cir. 1992) (*en banc*). ABT simply re-argues that the letters were not hearsay.

### 2.    There was insufficient testimony to establish marking

ABT had the burden to prove marking. *Motorola, Inc. v. United States*, 729 F.2d 765, 770 (Fed. Cir. 1984). Despite this, it failed to provide sufficient evidence of marking required under 35 U.S.C. § 287, which prohibits the recovery of damages when a patentee fails to provide notice of his patent. *See* 35 U.S.C. § 287(a). Section 287(a) states, in relevant part, that:

> In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

The patent holder may only seek damages for infringements that occur after the requisite notice. *See* 35 U.S.C. § 287; *Am. Med. Sys., Inc. v. Medi. Eng'g Corp.*, 6 F.3d 1523, 1536-38 (Fed. Cir. 1993).

Courts have construed § 287(a) to require that once marking has begun, it must be substantially consistent and continuous in order for the party to avail itself of the constructive notice provisions of the statute. *See Am. Med. Sys.*, 6 F.3d at

1536-38. When the failure to mark is caused by someone other than the patentee, the court may consider whether the patentee made reasonable efforts to ensure compliance with the marking requirements. *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111-12 (Fed. Cir. 1996).

The District Court's decision that the correspondence was inadmissible hearsay did not prevent ABT from proving substantially consistent and continuous marking by some other evidence. A5071-A5075. ABT failed to offer any such evidence. Despite being aware of the significance of this issue, ABT did not introduce evidence sufficient to show marking even if combined with the hearsay letters, as there was no evidence of the proportion of licensees that marked at the relevant time.

Appellant attempts to rely on Mr. Rudd's trial testimony to show that there was substantially consistent and continuous marking at the relevant time. But Mr. Rudd's testimony did not support such a finding. Mr. Rudd simply indicated that he typically went to trade shows once a year, and looked at the products then and sometimes when samples were sent to him. A5193-A5195. Nothing in that testimony indicated that he consistently checked the licensed products on any regular basis. None of that testimony shows when he checked the licensed products. Mr. Rudd's testimony only mentioned that one licensee, RPC, attended

the trade shows.  However, correspondence between Mr. Rudd and RPC indicated that RPC was not marking all of its products.  A1882, A5195.

Contrary to Appellant's argument, whether licensees put marking information in their literature is not enough.  *E.g., Calmar, Inc. v. Emson Res.*, 850 F. Supp. 861, 868 (C.D. Cal. 1994).  To the extent he physically saw marked products in the field or at tradeshows, Mr. Rudd provided neither specifics as to which products by which licensee were being marked nor specific dates as to when this so-called monitoring took place.  As explained in Appellant's brief, there are seven licensees, some of the licenses in force since 2003.  As Appellant argued on page 16 of its brief, in addition to the substantial number of unmarked units sold by Honeywell, other ABT licenses sold unmarked units.

Honeywell was by far ABT's largest licensee.  A6084-A6087.  In its brief at page 15, Appellant argues that Honeywell's sales were only past or pre-litigation sales that were licensed as part of a settlement agreement.  But the evidence shows this is not the case.  In fact, Honeywell produced a document, A6811, which shows substantial sales after the license was entered into in 2003.  This document was marked as an exhibit, A5569-A5570, and was admitted into evidence without objection.  A5733-A5756.  There is no evidence that Honeywell ever marked any of these products.  Quite the contrary, Honeywell refused to agree to a marking

49

provision. A5192. Thus, the only evidence in the record is that Honeywell refused to mark its products after the license was entered into.

Given the volume of Honeywell's sales of unmarked units, even assuming that each and every other licensed product was marked, ABT could not reach "substantial marking" compliance. At least one decision from this Court has held that marking is adequate if there is 88-91% compliance. *See Funai Elec. v. Daewoo Elecs.*, 616 F.3d 1357, 1374-75 (Fed. Cir. 2010). Here, Honeywell's unmarked sales account for more than 40% of the total units, leaving at most, less than 60% marked. Mr. Rudd did not testify to the practice of all of the licensees, and given the Tautrims report Appellant purports to rely upon is not evidence in the record, there is no evidence of whether there was substantially consistent and continuous marking at the relevant time.

Even if the letters between Mr. Rudd and the licensees are considered, the letters themselves show that there was not "substantially consistent and continuous" marking of licensed products. The correspondence between SCI and Mr. Rudd shows that SCI was not marking products until September 27, 2010, but agreed to do so on future sales. A1917. Similarly, the correspondence between Mr. Rudd and RPC indicated that two of the licensed products were not marked with the patent number until after 2010. A1882. These letters also fail to indicate

where the marking was located, and the number of products sold during the relevant period prior to the filing of this lawsuit.

In a case factually similar to this, this Court held that when the only steps taken to determine whether licensees were actually marking occurred after the start of litigation, the contractual language alone was insufficient to show the patent holder met its burden to show compliance. *See K&K Jump Start/Chargers v. Schumacher Elec. Corp.*, 52 Fed. Appx. 135, 141 (Fed. Cir. 2002) (granting JMOL on marking issue when Plaintiff failed to offer anything more than letters to its licensee inquiring into marking after the lawsuit had commenced).

## B.    ABT Did Not Prove The Damages It Seeks

Appellant requests a change in the damages awarded to permit it to recover damages for sales that it did not prove and to avoid a stipulation that it requested. It offers no support for the theory that such a thing can be done. Appellant's sole argument for the requested relief is that it was somehow Emerson's fault that ABT failed to introduce any evidence of Emerson's sales of its Big Blue thermostats.

ABT's excuse for not introducing evidence of sales prior to resting its case is that Emerson produced sales data late and in a confusing manner. There is no evidence to support this theory, which was first raised (and rejected) after the trial ended and the jury was dismissed. A3343-A3345. The transcript from the hearing

51

on Emerson's JMOL on damages shows that ABT simply failed to introduce the evidence it had.  A5630.

Following the District Court's grant of Emerson's JMOL on marking, Emerson moved for JMOL on damages arguing that there was no evidence in the record on which the jury could base an award for sales of Big Blue thermostats from the date of the lawsuit through the last sale.  A5669-A5670.  In response, ABT argued that a chart shown to the jury provided annual sales, which could be expanded to show total sales.  A5670-A5673.  At that time, ABT did not claim that the sales information produced by Emerson was produced later or difficult to understand.  In fact, ABT acknowledged that its damages expert saw Emerson's updated sales and revenue numbers, and they were included in the expert's report.  A5676-A5677.  These statements, made during trial, directly contradict Appellant's post-trial excuses.

### 1.    ABT requested the damages stipulation that it now claims was forced on it

During the trial, ABT was fully heard on the issue of damages.  In order to overturn the District Court's ruling, ABT must show that the ruling was not reasonable and there was no legally sufficient evidentiary basis for the District Court to find as it did.  Fed. R. Civ. P. 50(a).  ABT cannot make such a showing.  The District Court had only two options on this issue – either dismiss ABT's case for failing to prove damages, or permit ABT to reopen the case to submit the only

52

sales data seen by the jury. The District Court chose to protect ABT from its own failure, and such a decision was both reasonable and legally supported.

Appellant's brief at page 25 claims that the damages stipulation was forced on it, and ABT was required to accept it. The transcript shows otherwise. Emerson's JMOL on damages was presented on February 14, 2013. A5606. The District Court permitted the parties to brief the issues that afternoon and continue the hearing the next day. A5644. The morning of February 15, 2013, it was ABT that suggested omitting potential damages from 2009 and limiting damages to those Big Blue thermostats sold in 2010 and the first seven months of 2011:

> The COURT: That you are willing to in this situation, recognizing that I have already made a ruling limiting it to 2009, which I assume is a ruling you object to, but that under these circumstances, you would suggest that the jury only look to 2010 and the first seven months of 2011?
>
> MR. MAZZA: Correct, and recognizing -- we don't recognize any issue here and the fact that we don't want to unfairly prejudice Emerson on this point, that would be our solution.

A5671-A5673. The District Court accepted ABT's suggestion and agreement that it would only seek damages for that portion of the sales, and offered ABT an opportunity to re-open its case to add evidence of a limited number of sales by Emerson:

> I am going to permit the Plaintiff to reopen the case solely for the purpose of marking Figure 8 and placing it into evidence. And as I said, that is being – that is part and parcel of Plaintiffs offer not to seek damages with respect to 2009 because that would be based wholly on speculation.

A5675. The District Court went on to explain that once the chart identified as Figure 8 was entered as evidence, the figures for 2010, and the first seven months of 2011 were the only figures that were available to the jury. A5675- A5676. The District Court also noted that ABT was advised, well before trial, that if its damages expert updated his report, he needed to provide that to Emerson. A5677. ABT did not take that opportunity to prepare any additional proof of damages. *Id*.

ABT stipulated to the limited damages evidence in an attempt to avoid JMOL that it failed to prove any damages. Now that the trial is over and now on appeal, Appellant wants to be relieved from the stipulation that kept its case alive, and expand the evidentiary record to include Emerson sales that post-date the stipulated damages base that the jury was instructed to consider.

## 2.    No authority permits Appellant's request

Appellant cites no rule or case law that supports its extraordinary request. Not surprisingly, there is no such authority, a fact that was made plain to ABT by the District Court when it rejected ABT's same arguments raised in its improper post-trial motion practice. A19.

> The Court agrees with Defendant that Plaintiffs' realization that they should have done things differently during trial does not provide the Court with a basis to reopen the damages case two weeks after the jury returned its verdict. Plaintiffs had ample opportunity prior to trial to seek relief with regard to any tardy disclosures. If Defendant's sales evidence was not clear, the time to clarify it was before or even during trial, not after the jury returned its verdict. In none of the cases cited by Plaintiffs did a court reopen a case for additional evidence on damages, after the jury had been discharged. Nor have Plaintiffs cited a case in which Rule 60(b) was applied in a context similar to the one here.

*Id.*

At pages 25-26 of its brief, Appellant argues that when a defendant prevents a patent holder from determining damages, the doubt should be resolved against the infringer. That is not relevant here, as there is no evidence that Emerson prevented ABT from determining damages. ABT was provided with sales information as the lawsuit progressed. At no time until after the verdict was rendered and the jurors were dismissed did ABT claim that it was unable to understand the sales and revenue data. ABT's damages expert prepared a report prior to trial, as did Emerson's. A5445, A6020-A6021. Both contained an analysis of the sales data.

Appellant, at page 28 of its brief, also makes the unsupported argument that Emerson misrepresented when it ceased infringing sales. Appellant is wrong. First, as with Appellant's other arguments, ABT did not make this argument until

55

after the trial, but it is also wrong in the facts. Emerson stopped making allegedly infringing sales in October 2012, and accurately advised ABT of that fact. A5733-A5734, A5742. As ABT was advised, Emerson did not change the model numbers when it removed the CFF feature from its thermostats. The sales after October 2012 did not have the CFF feature and could not infringe the '017 patent. A3483-A3484.

Additionally, ABT's argument that Emerson failed to respond to ABT's questions in an effort to force the District Court to ignore infringing sales after April 30, 2011, is not supported by evidence, and is not supported by the e-mail string cited by Appellant. First, this argument was not raised until after trial, and it was therefore waived. Second, the e-mail string is dated February 19, 2013, A3475-A3476, and the District Court's acceptance of ABT's voluntary stipulation to limit damages to those sales made in 2010 and the first seven months of 2011, was made on February 15. A5672. As such, the damages stipulation was accepted four days before the e-mail exchange. Third, the e-mail string does not ask whether the model numbers listed in Emerson's sales spreadsheets included the CFF feature, as Appellant now claims at page 28 of its brief. Emerson responded by indicating that it may have misunderstood ABT's question, and asked if ABT had specific concerns. ABT's argument that the e-mail response on February 19,

2013, somehow drove the District Court to limit damages to the period of time stipulated by ABT four days earlier is illogical.

ABT had the burden of proof on the issue of damages. ABT was given sales data for the accused thermostats from the very first sale in 2006 until the last sale in October 2012. ABT did not introduce this evidence at trial before resting its case on Thursday, February 14, 2013. ABT cannot now enlarge its damages case by way of this appeal. ABT's realization that it should have done things differently is not Emerson's fault. The District Court agreed. A19. It does not provide any basis to reopen the damages case.

Appellant provides no authority for the relief it requests. ABT's failure to introduce this evidence at trial is its fault, not Emerson's.

### C.    It Would Be Futile To Address The Objective Prong Of The Willfulness Analysis

Without citing to any authority or providing the relevant standard of review for the District Court's denial of ABT's motion for a finding of pre-lawsuit willfulness, Appellant requests that this Court direct the District Court to revisit the objective prong of the willfulness inquiry. Such a request is inappropriate.

As discussed above, no damages were awarded prior to the filing of this lawsuit. Under these circumstances, ABT has not identified any authority to permit enhanced damages under 35 U.S.C. § 284. To award enhanced damages, the District Court would need to make a pre-lawsuit infringement finding as well

as a determination of the number of pre-lawsuit infringing sales that were made, neither of which it is in a position to do based on the record at trial. Remanding this issue to the District Court would be futile.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

Emerson asks that the Court vacate the District Court's denial of Emerson's JMOL of obviousness and reverse the judgment that claims 1-5 of the '017 patent are not invalid, finding them to be invalid as obvious, which moots Appellant's arguments in its appeal.

In the event that this Court holds that the '017 patent is not invalid as obvious, Emerson asks that the District Court's decision on marking, damages and no pre-suit willfulness be affirmed.

4814-3376-5917.5

Dated:        October 28, 2014              Respectfully submitted,


                                            /s/ Kadie M. Jelenchick
                                            Linda E.B. Hansen
                                            Jeffrey N. Costakos
                                            Kadie M. Jelenchick
                                            FOLEY & LARDNER LLP
                                            777 East Wisconsin Avenue
                                            Milwaukee, WI 53202
                                            414-271-2400
                                            lhansen@foley.com
                                            jcostakos@foley.com
                                            kjelenchick@foley.com

                                            *Counsel for Cross-Appellant
                                            Emerson Electric Co.*

4814-3376-5917.5

# United States Court of Appeals
## for the Federal Circuit

*ABT Systems, LLC v. Emerson Electric Co., LLP,* 2014-1618, -1700

### CERTIFICATE OF SERVICE

I, John C. Kruesi, Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by FOLEY & LARDNER LLP, Attorneys for Cross-Appellant to print this document. I am an employee of Counsel Press.

On **October 28, 2014** counsel has authorized me to electronically file the foregoing **Corrected Brief for Cross-Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

MICHAEL P. MAZZA
DANA ALVARADO
MICHAEL P. MAZZA, LLC
686 Crecent Boulevard
Glen Ellyn, IL 60137
mazza@mazzallc.com
dana@mazzallc.com
*Counsel for Plaintiff-Appellant*

Paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court.

The brief was originally filed and served on October 27, 2014. Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court within the time provided in the Court's rules.

October 28, 2014                                   /s/ John C. Kruesi, Jr.
                                                   Counsel Press

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

___X___ The brief contains _12,746_____ words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

_____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

___X___ The brief has been prepared in a proportionally spaced typeface using MS Word 2013 in a 14 point Times New Roman font or

_____ The brief has been prepared in a monospaced typeface using _____ _____in a ___ characters per inch_____ font.

October 28, 2014                    /s/ Kadie M. Jelenchick
Date                                Counsel for Cross-Appellant